(No. 21514.—

THE PEOPLE *ex rel.* Oscar E. Carlstrom, Attorney General, *vs.* FRANK W. HATCH *et al.*—(ALICE H. McDOUGALL *et al.* Appellees, *vs.* THE STATE OF ILLINOIS *et al.* Appellants.)

*Opinion filed December 23, 1932.*

Oscar E. Carlstrom, Attorney General, S. S. Du-Hamel, and George C. Hoffmann, for appellants.

Brown, Fox & Blumberg, and Hall & Hulse, (Nathan S. Blumberg, and Albert L. Hall, of counsel,) for appellees.

Mr. Chief Justice Heard delivered the opinion of the court:

Oscar E. Carlstrom, Attorney General of the State of Illinois, on behalf of the People of the State of Illinois, filed a bill in the circuit court of Lake county to quiet the title of the State of Illinois in premises in Lake county described in the bill as follows: "All of section 15, township 46 north, range 9, east of the third principal meridian, lying easterly of the center thread of the Fox river and northerly of the low-water mark of Grass Lake, except the north one-half of the northeast quarter of section 15; also all that part of section 22 in said township lying easterly of the center thread of the Fox river and westerly of the

low-water mark of Grass Lake, except that part thereof heretofore conveyed to George H. Nelson and Lizzie Nelson by deed recorded October 21, 1910, all of which land, (except 19.38 acres in the northeast quarter-quarter of the northwest quarter of said section 15,) together with land owned by complainant in section 10 of said township, lies within the meander line of Lake Pistakee." The county of Lake filed an answer, claiming to hold title in fee to the lands by virtue of the Swamp Land act. Defendant Frank W. Hatch filed an answer claiming possession and title to the premises and filed a cross-bill praying that the title should be confirmed in him. The court, after a hearing, entered a decree confirming the title in the heirs-at-law of the defendant and cross-complainant, Hatch, he having died during the pendency of the suit, and such heirs were substituted in his stead.

The original survey of township 46 north, range 9 east of the third principal meridian, was made by James Galloway within a year or two prior to September 17, 1839, on which date it was approved by William Melbourne, the surveyor general, and a copy of the plat of such survey was filed in the land office at Washington and is in evidence in this case. This plat shows Lake Pistakee to be a navigable body of water in township 46 north, range 9 east, and its outlines are meandered upon the plat. The lands in controversy are within these meander lines. By the act of Congress of September 28, 1850, the swamp and overflowed lands of the various States, including Illinois, remaining unsold, were granted to the several States. On June 22, 1852, the legislature of Illinois passed a statute which provided that all swamp and overflowed lands granted to the State of Illinois by the act of Congress of September 28, 1850, be granted to the counties, respectively, in which the same might lie, for the purpose of reclaiming the same. A history of this legislation and its details may be found in *Dupue Rod and Gun Club* v. *Marliere,* 332 Ill. 322.

After the plat of the Galloway survey was filed, complaint was made to the land office that the survey was erroneous in that there was no such lake as Lake Pistakee where platted and in other respects. An application was made in September, 1875, to have the lands lying within the meandered lines of the lake subdivided and surveyed. The application was allowed and Alexander Walcott was appointed deputy surveyor, and in 1875 and 1876 he made an examination and survey of the lands and by his field notes showed the non-existence of "Lake Pistakee navigable," and that the lands were swamp, marsh and overflowed lands. The Galloway plat showed an area in township 46 of 1561.50 acres of public lands and an estimated area of 5834.11 acres covered by the Fox river and Lake Pistakee. Walcott's survey divided this area into 410 acres of river, 2457 acres of shallow lakes, 606 acres of agricultural lands and 2361 acres of marsh lands. No new plat of the township in question was made, but the plat of the Walcott survey of the bed of Lake Pistakee was superimposed upon the plat made by Galloway and the section lines were protracted across the plat of this survey. Areas were shown on the amended plat of all the subdivisions made by Walcott. This amended plat was sent to the register at Springfield and to the State land office on March 25, 1876. After Walcott's survey was completed, complaints were made to the land office with reference to Walcott's survey and it was ordered suspended until the commissioner could examine into the complaints. On June 5, 1877, Jacob Bausman, a clerk in the Division of Surveys, was appointed to examine the Walcott survey. He made a personal examination of the territory surveyed by Walcott, including the lands here in question, and on June 26, 1877, he reported to the land commission at Washington that there never was a Lake Pistakee in township 46; that the premises shown on Galloway's survey to be the bed of the lake lying east of the Fox river and west of Grass Lake were, in fact,

swamp and marsh lands. The commissioner adopted Bausman's report and endorsed on the back of it an order removing the suspension of the Walcott plat. The Walcott plat was endorsed with a note that the suspension was removed by the commissioner June 28, 1877. Since that time no further survey of the premises in question has been made. This amended plat and Walcott's findings certified by the register of the land office were introduced in evidence and such plat is competent evidence under the laws of this State. *Wyman* v. *City of Chicago,* 254 Ill. 202; *Seely* v. *Wells,* 53 id. 120.

Prior to the approval of Walcott's survey, patents had not been issued by the government covering any of the lands in question, but in 1887 such lands were thrown open to entry under the Soldiers' Homestead act, and homestead entries were made at Springfield, Illinois, under the direction of the United States land department, upon the lands within the meandered lines shown on the Galloway survey, and thereafter patents were issued by the Secretary of the Interior to nineteen different persons who had entered this land. Thereafter all of these entries and patents were canceled by the United States and the patentees were allowed to make homestead entries upon other lands under their soldier's scrip, for the reason that at the time of the issuing of the patents the lands did not belong to the United States but did belong to the State of Illinois or its grantees.

Appellants contend that the United States government, in establishing a meander line around the lake designated as Lake Pistakee, conceded the title to all lands within such meander line to be in the State of Illinois. It is a general rule that in cases where the government has meandered a lake and shown the same on its survey by meander lines the title to such lake is vested in the State in trust for the people. (*Dupue Rod and Gun Club* v. *Marliere, supra; Wilton* v. *VanHessen,* 249 Ill. 182.) The surveyor can not, however, by making meander lines on a plat create a

permanent body of water where, in fact, no water exists or ever existed. (*French-Glenn Live Stock Co.* v. *Springer,* 185 U. S. 47; *Security L. & E. Co.* v. *Burns,* 193 id. 167; *Horne* v. *Smith,* 159 id. 40.) As said in *Niles* v. *Cedar Point Club,* 175 U. S. 300, "there is no magic in the meander line." In *Gauthier* v. *Morrison,* 232 U. S. 452, it is said: "But in this there was a misconception of the authority of the surveyor. He was not invested with power to determine the character of the land which he surveyed or left unsurveyed or to classify it as within or without the operation of particular laws. All that he was to do in that regard was to note and report its character as it appeared to him, as a means of enlarging the sources of information upon that subject otherwise available." When the land department of the United States discovered that there had been a mistake in the Galloway plat in meandering Lake Pistakee it properly corrected the plat and the original meandering had thereafter no effect. (*Fuller* v. *Shedd,* 161 Ill. 462.) In *Lee, Wilson & Co.* v. *United States,* 245 U. S. 24, it is said: "But where, upon the assumption of the existence of a body of water or lake, a meander line is through fraud or error mistakenly run because there is no such body of water, riparian rights do not attach because in the nature of things the condition upon which they depend does not exist, and upon the discovery of the mistake it is within the power of the land department of the United States to deal with the area which was excluded from the survey, to cause it to be surveyed and to lawfully dispose of it." It is to be noted that the Lake Pistakee mentioned in *Wilkinson* v. *Watts,* 309 Ill. 607, is not the one here in question, as that was located some miles from the premises here in question, in township 45 instead of in township 46.

It is claimed by appellants that lands which the United States government has refused to survey within the meander line of a lake do not pass to the State under the Swamp

Land act, and that such act did not convey lands of its own force, without survey, selection or patent. In the present case the United States did not refuse to survey the lands within the meander lines, but, on the contrary, did re-survey them and divided them into government subdivisions, changing the original plat to conform to such re-survey and subdivision and by official order approved such plat as amended.

Appellants contend that the lands in question having been designated by neither the government nor the State of Illinois as swamp lands, they did not pass from the government to the State by the act of 1850, and from the State to Lake county under the act of 1852, as swamp lands. It was not necessary to show that the lands had been classified as swamp lands. By the act of Congress of 1850 the State was invested with the title to all swamp and overflowed lands within its boundaries which had not been patented and all such swamp and overflowed lands were granted to the counties within their borders by the State in 1852. These lands were overflowed lands—part land and part water—and nothing more than proof of that fact was necessary to invest Lake county with the title. (*DeProft* v. *Heydecker,* 297 Ill. 541; *Burns* v. *Curran,* 275 id. 448; *Wabash, St. Louis and Pacific Railway Co.* v. *McDougal,* 113 id. 603; *Hannibal and St. Joseph Railroad Co.* v. *Smith,* 9 Wall. 95.) In *Wright* v. *Roseberry,* 121 U. S. 448, the earlier decisions of that court are reviewed, and it is said: "The result of these decisions is, that the grant of 1850 is one *in præsenti,* passing the title to the lands as of its date but requiring identification of the lands to render the title perfect; that the action of the Secretary in identifying them is conclusive against collateral attack as the judgment of a special tribunal to which the determination of the matter is intrusted, but when that officer has neglected or failed to make the identification it is competent for the grantees of the State, to prevent their

rights from being defeated, to identify the lands in any appropriate mode which will effect that object. A resort to such mode of identification would also seem to be permissible where the Secretary declares his inability to certify the lands to the State for any cause other than a consideration of their character."

In its decree the court found, among other things, "that the land above described, and the whole or greater part of each quarter-quarter section thereof, is swamp land, and at certain times of the year, particularly in the spring of the year, the greater part of said premises is overflowed by waters of the Fox river and Grass Lake, upon which the same abut, and all of the said land is, and at all times has been, unfit for agricultural purposes. Said premises were not at the time of the admission of the State of Illinois into the Union, or since that time, the bed of a navigable lake or the bed of any permanent body of water; that no Pistakee Lake, or any lake in manner and form as alleged in the original bill of complaint of the People of the State of Illinois herein, ever existed in township 46 north, range 9 east of the third principal meridian, in Lake county, Illinois; * * * that a large portion of said land shown as the bed of said lake at the time of the approval of said plat and the making of said alleged survey, and at all times prior thereto and prior to the admission of the State of Illinois into the Union, and ever since that time, were swamp, marsh and overflowed lands." The evidence on which this finding was based consisted of documentary evidence from the land department of the United States, such as surveys, surveyors' reports of examinations made on the ground as to the accuracy of the surveys by agents of the United States duly appointed to make such examinations; the testimony of old men living in the neighborhood; the topography of the land; the testimony of ecologists, one of whom testified that the premises in question could not have been the bed of navigable water within 1100 years, and

that this was in part shown by the fact that the plant life forming the soil to a depth of from four to six feet was non-aquatic, that test holes dug by him showed muck or peat from a depth of four to six feet and below the muck or peat a layer of lake clay, and that the average formation of peat or muck was two or three inches a century, and that the maximum rate of formation was six inches a century. From a careful examination of such oral and documentary evidence we are of the opinion that the finding of the court in this respect is fully supported by a clear preponderance of the evidence.

The court in its decree found that appellees had title to the premises in question based on adverse possession for over fifty years and color of title and payment of taxes for much longer than the statutory period. No question seems to be raised by appellants in their brief as to the existence of such adverse possession, color of title and payment of taxes, but it is contended that appellees could not obtain title as against the State by adverse possession and in their brief say: "If any right, title or interest in and to these lands in question vested in the State under the Swamp Land act and then vested in the county of Lake, then the defendant Hatch might make some claim by virtue of his adverse possession." In *Gerbracht* v. *Lake County,* 328 Ill. 399, this court said: "The title to such lands [swamp lands] may be acquired against the county by prescription, as the Statute of Limitations runs against the county in favor of the party holding swamp lands adversely against it. (*Piatt County* v. *Goodell,* 97 Ill. 84; *Hammond* v. *Shepard,* 186 id. 235; *Schulte* v. *Warren,* 218 id. 108.) Title by adverse possession, well established by appellee, might be used by her as a basis for having her title declared and quieted by a bill in equity.—*Kepley* v. *Scully,* 185 Ill. 52; *Bugner* v. *Chicago Title and Trust Co.* 280 id. 620." A title acquired by adverse possession may be used as the basis for a bill in equity to quiet title, as the bar of the statute in

such case is just as available for attack as for defense. *Bugner* v. *Chicago Title and Trust Co. supra; Mason* v. *Odum,* 210 Ill. 471.

The circuit court properly found the title of the property in question to be in appellees, and its decree is affirmed.

*Decree affirmed.*